The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.



Mary Ann Whipple
United States Bankruptcy Judge

Dated: June 7 2017

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 17-30905 |
| | ) | |
| BCC Sandusky Permanent LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | JUDGE MARY ANN WHIPPLE |

**MEMORANDUM OF DECISION AND ORDER REGARDING MOTIONS TO DISMISS**

This case came before the court for an evidentiary hearing on motions to dismiss filed by the United States Trustee ("the UST") [Doc. # 28] and the Bank of New York Mellon Trust Company National Association, as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2007-IQ14 ("Lender") [Doc. # 37], Debtor's objection to the motions [Doc. # 51], and Lender's reply [Doc. # 53]. The UST and Lender seek dismissal of this case for cause under 11 U.S.C. § 1112(b). Both contend that Debtor filed its Chapter 11 petition in bad faith. In addition, the UST seeks dismissal under § 1112(b)(4)(A).

At the hearing, the parties agreed that one record would be created on which the court can rely in addressing both the UST's and Lender's motions. In addition to testimony and evidence offered at the hearing, the court takes judicial notice of the contents of the docket in the related foreclosure action commenced in the United States District Court, Northern District of Ohio, Case No. 3:16-CV-00393, pursuant to Rule 201 of the Federal Rules of Civil Procedure, made applicable in this case by Rule 9017 of

the Federal Rules of Bankruptcy Procedure, and pursuant to this court's notice to the parties regarding its intent to take such judicial notice [Doc. # 64] and Lender's response [Doc. # 66]. For the reasons that follow, the motions will be denied.

## FACTUAL BACKGROUND

BCC Sandusky Permanent LLC ("Debtor") owns real estate in Sandusky, Ohio, that is a shopping center generally known as Crossings of Sandusky ("the Property"). Timothy Baird ("Baird") and Matthew Daniels ("Daniels") were co-managers of Debtor. Baird and L.A.D. Holdings, LLC ("L.A.D. Holdings") are members of Debtor, each holding a 41.25% interest. [Lender Ex. 17, p. 125]. Daniels is the manager and sole employee of L.A.D. Holdings, which is owned by his wife's trust, the Lori Ann Daniels Irrevocable Trust. [*Id.* at 26]. There are six additional members holding minority interests in Debtor.

Debtor's business operations involve leasing the structures and the land to the various retail business establishments that operate at the Property, including national retailers such as Home Depot, Jo-Ann Fabrics, and Petco. There are currently thirteen tenants that lease space at the Property from Debtor and who occupy 92.17% of the total space available for lease. [*See* Debtor Ex. C, pp. 21-22; Lender Ex. 16, p. 14/42]. There are currently two spaces vacant – one space consisting of 13,500 square feet and one space consisting of 1,940 square feet. [*Id.*].

Lender has an interest in the Property pursuant to certain loan documents, which include a Promissory Note ("Note"), Loan Agreement, Open-End Mortgage and Security Agreement ("Mortgage"), and an Assignment of Leases and Rents ("Assignment of Rents"), all executed by Daniels on behalf of Debtor on March 22, 2007.[1] [Lender Exs. 2-5]. The Note is a non-recourse[2] note in the principal amount of $21,500,000.00 and is secured by the Mortgage on the Property as well as the Assignment of Rents. [Lender Exs. 2, 4 & 5]. In addition to failing to make required interest only payments under the loan, events of default under the Mortgage include, among other things, the failure to remain a single-purpose entity and failure to observe certain covenants and conditions in loan documents. [Lender Ex. 4, pp. 24-

---

[1] The Note, Mortgage and Assignment of Rents were executed in favor of Principal Commercial Funding, LLC, which later assigned them to Principal Commercial Funding II, LLC. [*See* Lender Exs. 2, 6]. The Mortgage and Assignment of Rents was later assigned to Lender, [Lender Ex. 7], and Lender is the holder of the Note, [Lender Ex. 1, ¶ 4].

[2] The court uses the term non-recourse here as short hand to describe the first paragraph of paragraph 9 of the Note. [Lender's Ex. 2, p. 4/10]. *But cf.* 11 U.S.C. § 1111(b). In doing so it is not making any finding for federal income tax purposes as to any party or whether any of the exceptions subsequently listed in paragraph 9 of the Note apply. Also, scattered references to guarantors appear in various of the Loan Documents, [*e.g.* Lender's Ex. 3, p. 3/22], but the court does not know whether there are any.

26/46]. Remaining a single-purpose entity required, among other things, that Debtor "not commingle its funds or assets with those of any other person or Entity" and "not make loans to any person or Entity." [Lender Ex. 3, p. 5/22].

After Baird's wife had obtained a judgment against him in the amount of two million dollars in connection with divorce proceedings and a charging order against Baird's ownership interests in twenty-three entities, [*see* District Court Case No. 3:16-CV-393, Doc. # 9-11 & 9-12], she filed a lawsuit in the Hamilton County, Ohio, Court of Common Pleas ("State Court") captioned Suzanne D Baird v. 9549 Montgomery Road, LLC, et al.(Case No. A1201593) (the "Baird Litigation"). [*See id.* at Doc.# 9-12, p. 1-2; Lender Ex. 18, p. 12-13]. According to Daniels's affidavit filed in the Baird Litigation, Baird had allegedly diverted funds from his companies, including Debtor, to avoid paying the judgment obtained by his wife. [District Court Case No. 3:16-CV-393, Doc. # 9-13]. On December 6, 2013, the State Court entered an order removing Baird as a manager of, and member exercising managing powers over, each of the entities in which Baird has an ownership interest and appointing George Fels ("Fels") "to manage, operate, and govern each of the LLCs subject to the Charging Order." [*Id.* at Doc. # 9-12, ¶ 1]. Thus, after December 6, 2013, Fels and Daniels were acting as co-managers of Debtor.

By December 2013, the majority of the leases at the Property had expired and were on a month to month tenancy. [Lenders Ex. 17, p. 54]. There was also only an eighty percent occupancy at that time. [*Id.* at 55]. In early 2014, Daniels formed a real estate management company, American Capital Partners Management LLC ("ACPM"), of which he was the sole member and manager. [*Id.* at 20-21, 27]. ACPM employed several people, including an office manager and an accountant. [*Id.* at 21, 24].

Debtor's Operating Agreement provides that its managers "shall appoint a property manager for management of the Company's real estate and any interests therein" and further provides that "[t]he property manager may be . . . an affiliate of one or more of the Managers." [Lender Ex. 20, ¶ 6.5]. Fels, on behalf of Debtor, entered into a Management Agreement with ACPM, effective from the date of Fels's appointment as co-manager, which made ACPM responsible for the management, maintenance and operation of the Property. [Lender Ex. 21]. The Management Agreement provides for a management fee in the amount of 4% of the gross monthly collections from tenants (*i.e.* rent, common area maintenance charges, and other miscellaneous charges) but not less than $1,500.00. [*Id.* at ¶ 6.1]. It also provides for a lease administration fee in the event that ACPM "leases, renews or amends a lease with a Tenant and Tenant executes a lease with [Debtor]." [*Id.* at ¶ 6.3]. The lease administration fee is equal to 4.5%, or 3% if an exclusive listing

3

agreement with a broker is involved, of the "gross base rental income over the primary term of a lease, renewal or amendment." [*Id.*].

In 2015, in the process of Daniels negotiating a lease agreement with Jo-Ann Fabrics, an issue arose regarding Debtor's failure to make certain required tenant improvement escrow payments in 2013. [Lender Ex. 17, p. 77-78 and Ex. 18, p. 21]. The tenant improvement escrow fund held by Lender was deficient in the amount of $379,500.00 [Lender Ex. 19]. Lender thus refused to release any tenant improvement funds it was holding, and Debtor was not able to reimburse Jo-Ann Fabrics for the $480,000.00 cost of improvements as required under the lease. [Lender Ex. 17, p. 77-78; *see* Lender Ex. 30]. As a result and in accordance with its lease, in July 2015, Jo-Ann Fabrics began offsetting from its rent the amount owed plus interest. [Lender Ex. 30].

On July 10, 2015, Lender sent a letter notifying Debtor that its failure to make the July 1, 2015, debt service and tax escrow payment and the failure to make the required tenant improvement escrow payments were events of default. [Lender Ex. 19]. Lender demanded a wire transfer deposit in the amount of $630,729.14, which included $320,000.00 for eight missed tenant improvement escrow payments in 2013 and $59,500.00 for unpaid tenant improvement escrow payments from January through July 2015, for a total tenant improvement escrow deficiency of $379,500.00. [*Id.*].

In April 2015, Debtor had obtained a letter of interest for the purchase of the Property for a purchase price of $28,000,000.00 and an offer in 2016 for $29,500,000.00, neither of which resulted in a sale contract. [Lender Ex. 17, p. 91; Debtor Ex. A]. After becoming aware of the tenant improvement escrow deficiency and Debtor not having the cash to bring it current, Fels began urging Daniels "to do more, to find more solutions." [Lender Ex. 18, p. 21-22]. His weekly meetings with Daniels became more frequent and he had telephone conferences with Daniels four or five times per week. [*Id.* at 22]. Daniels reminded him that Debtor has no employees and as a manager, he is not entitled to compensation. [*Id.* at 22; *see* Lender Ex. 20, ¶ 6.4]. Thus, as Daniels began to do more, working with consultants and other entities that provide financing for distressed debt, Fels, on behalf of Debtor, entered into two additional agreements with ACPM – an Administration, Services Fee Agreement and a Management of Desposition (sic) Fee Agreement. [*Id.* at 23-4; Lender Exs. 26, 24].

The Administration, Services Fee Agreement (the "DLAA") provides that, effective May 5, 2015, Debtor will pay ACPM the following fees for services: a Disposition Administration Fee, a Loan Servicing Fee, and an Asset Administration Fee. [Lender Ex. 26]. Although the DLAA was never signed by Fels, he

explained that they began working under the terms of the agreement in mid-2015 when fees under the agreement began to be paid. [Lender Ex. 48].

Daniels testified at his Rule 2004 examination regarding the work under each of the services contemplated by the DLAA. The Disposition Administration Fee was for work regarding loan disposition, either through refinancing or a loan modification. [Lender Ex. 17, p. 50]. The Loan Servicing Administration Fee was for servicing the loan on a daily, weekly, and monthly basis, making sure the mortgage and tax escrow payment was properly calculated and paid, and dealing with the servicer on needs that it had. [*Id.* at 55-56]. The Asset Administration Fee was for dealing with such matters as "a large lease like Jo-Ann Fabrics," working with attorneys with respect to two large takings at the Property and coming to an agreement on the appraisal of that property, working with attorneys with respect to a foreclosure suit, assisting in making sure corporate accounting was correct, working on the corporate budget, and deciding under what terms the Property should be sold. [*Id.* at 57-58].

The DLAA did not provide any hourly rate or other method for calculating fees to be paid under that agreement. According to Daniels, he and others at ACPM would consider the time and effort employed and the sophistication of the work being done and determine the value of the services. [*Id.* at 46-48]. An invoice in that amount, without specific time records or a fee breakout between disposition, loan servicing and asset administration, would then be submitted to Fels for approval. [*Id.* at 48-49]. The invoice would then be discussed "pretty intently" at their weekly meetings. [*Id.* at 48; Lender Ex. 18, p. 42]. Fels approved for payment all of the invoices submitted. [Lender Ex. 18, p. 42]. Between August 2015 and June 3, 2016, ACPM was paid approximately $400,000.00 under the DLAA. [Lender Ex. 17, p. 71].

Fels, on behalf of Debtor, also entered into the Management of Desposition (sic) Fee Agreement, which provided that Debtor would pay ACPM "a disposition fee of 1% of the sales price to manage the marketing, broker, legal and closing of the sale of [Debtor]." [Lender Ex. 24]. The agreement further states that the fee "is to be paid from the title company the day of closing." [*Id.*]. Daniels testified at his Rule 2004 examination that his work under this agreement relates to selling the Property (as distinguished from loan disposition), managing brokers selected to sell the Property, making sure the offering package is correct, preparing budget pro formas, meeting with interested buyers, negotiating letters of intent, managing the closing process. [Lender Ex. 17, pp. 60-61].

Notwithstanding the terms of the agreement, Fels agreed that ACPM could receive advance payments rather than payment at closing of a sale in light of the "massive amount of work" it was doing and

5

the extended length of time involved. [*Id.* at 64-65]. At his Rule 2004 examination, Daniels testified that ACPM submitted invoices for payment based upon the effort that was put into work regarding the sale of Debtor. [*Id.* at 65]. According to Daniels, the agreement was amended to provide for payment at closing "or as otherwise agreed." [*Id.* at 63]. However, according to Fels, the advance payments were a contingency fee, a prepayment that would have be repaid if no successful sale occurs. [Lender Ex. 18, p. 23, 35-36]. Between August 2015 and May 2016, ACPM was paid $297,000.00 under the Management of Desposition (sic) Fee Agreement based upon an estimated sale price of $32,000,000.00. [*Id.* at 34, 96; Lender Ex. 25, p. 2/3].

After receiving the July 10, 2015, notice of default and demand for payment, Debtor made the interest only payments on the Note in August, September, November and December 2015. [Lender Ex. 28, p. 14/15]. It did not address the tenant improvement escrow deficiency. At his Rule 2004 examination, Fels testified that after making the interest only payments and not funding the tenant improvement escrow, Debtor had $30,000 to $35,000 excess cash each month. [Lender Ex. 18, p. 28]. He testified that this was not enough to cure the deficiency in the tenant improvement escrow but was enough to allow him to sell off the other single purpose entities in which Baird held an interest and that he was charged with selling pursuant to the state court order in the Baird Litigation. [*Id.* at 28]. He further testified that he used approximately $90,000 of Debtor's excess cash to make intercompany loans to some of those entities in order to effectuate their sale. [*Id.* at 28, 33]. He testified that had he not done so, he "would have lost those other entities" and that he was not aware of restrictions on intercompany loans in the Operating Agreement.[3] [*Id.* at 28, 31].

Fels also used $12,417.08 of Debtor's excess cash to pay the fees of his attorney, Bingham, Greenbaum and Doll, with respect to the Baird Litigation. [*Id.* at 75; Lender Ex. 28, p. 5/15]. Fels explained that was accounted for as a capital distribution to Baird, and a capital distribution in the same amount was made to L.A.D. Holdings. [Lender Ex. 18, p. 75]. According to Fels, his state court appointment allows him to pay his attorney from any of the twenty-three entities in which Baird holds an interest. [*Id.* at 13].

Fels testified at his Rule 2004 examination that by January 2016, it was obvious to him that he needed to use Debtor's excess cash "in every way we could to bring a solution or resolution to this problem. To continue to make those interest payments, we would have had no money left. . . and still not been out

---

[3] According to Fels, Debtor's "outside CPA would classify [an inter-company loan] as a [capital] distribution at one place and a capital call, capital contribution at another." [Lender Ex. 18, p. 29].

of the soup." [*Id.* at 57-58]. He believed it to be in the best interest of Debtor to stop making the interest payments and use the money to try to market the property or obtain a loan modification. [*Id.* at 58]. Thus, no debt service payments were made after December 2015. [*See* Lender Ex. 28, p. 14/15].

On February 19, 2016, Lender commenced an action in the United States District Court for the Northern District of Ohio ("District Court") to collect on the Note and to foreclose on the Mortgage ("Foreclosure Action"). [District Court Case No. 3:16-CV-393]. In addition to Debtor, Randall J. Goodman and Goodman Real Estate Services Group, LLC (collectively, "Goodman") were named as defendants in the Foreclosure Action. [*Id.* at Doc. # 1]. Goodman held a recorded lien against the Property due to Debtor's failure to pay it a commission relating to the Jo-Ann Fabric lease. [*Id.* at Doc. # 9, Ex. C; Lender Ex. 15, Response No. 12]. On April 21, 2016, the District Court entered default judgments against Goodman, ordering its lien foreclosed and cancelled. [District Court Case No. 3:16-CV-393, Doc. ## 23 & 24].

On June 8, 2016, the District Court granted Lender's motion for the appointment of a receiver. [Lender Ex. 8]. The District Court appointed NAI Daus as receiver, [*Id.* at 6/37], who in turn has employed Ira Krumholz to manage the Property. NAI Daus ("Receiver") operates under a license agreement with New America Network, Inc., d/b/a NAI Global ("NAI Global"). NAI Global is a wholly owned subsidiary of C-III Capital Partners LLC. C-III Asset Management LLC, is the Special Servicer for Lender, and is also a wholly owned subsidiary of C-III Capital Partners LLC. [*Id.*] The District Court's order provides, among other things, that "[t]he Receiver shall, upon the entry of judgment in mortgage foreclosure, be authorized to expose the Property to public foreclosure sale pursuant to 28 U.S.C. § 2001, et seq., and shall thereafter pass title to the Property to the successful bidder." [*Id.* at 18/37]. At the time the Receiver was appointed, occupancy at the Property had been increased from eighty percent to approximately ninety-two percent under the management of Fels and Daniels. [Lender Ex. 17, p. 55].

There is no dispute that the Receiver has successfully managed Debtor since its appointment and that Debtor is a performing entity. The most recent report filed in the District Court by the Receiver is the monthly financial report for February 2017, which shows a year-to-date positive cash flow in the amount of $337,314.50 and year-to-date net income in the amount of $167,904.11. [District Court Case No. 3:16-CV-393, Doc. # 65-1, pp. 8/42 & 40/42].

On February 28, 2017, the District Court entered an Amended Judgment Entry in Mortgage Foreclosure ("Judgment Entry"). [Lender Ex. 11]. The Judgment Entry fixed the amount due under the Note

7

and Mortgage, as of October 6, 2016, at $23,779,332.25,[4] plus per diem and default interest from that date until the foreclosure sale, plus "any and all other amounts advanced by Plaintiff during the pendency of this action, together with additional costs and/or protective advances made by or on behalf of [Lender], together with [Lender's] attorney fees and costs incurred in this action, less sums, if any, paid to [Lender] by the Receiver. . ., and all of the foregoing as incurred by [Lender] through the confirmation and completion of the foreclosure." [*Id.* at 4/13].  The Judgment Entry states that the "Mortgaged Property shall be sold at public foreclosure sale with the U.S. Marshal Service or the Court-appointed receiver in this action having the power and authority pursuant to 28 U.S.C. Section 2001, *et seq.* to conduct said public foreclosure sale on such terms and conditions as it shall advertise and directing that from the proceeds of the foreclosure sale, if any, that Plaintiff be paid the amount due on the Mortgage with interest, advances and costs as more fully identified above." [*Id.* at 4-5/13].

A representative of NAI Daus testified that notice of the foreclosure sale was published in "a legal journal" and was posted on site at the Property.  The "Notice - Proof of Publication" filed in the District Court indicates that the Notice of Receiver's Sale ("Receiver's Notice") was published four times during the month of March 2017 in the Sandusky Register, the last day of publication being March 23, 2017. [District Court Case No. 3:16-CV-393, Doc. # 66].  The Receiver's Notice states that the sale will take place on March 31, 2017, at 11:00 a.m., at the Property. [*Id.* at Doc. # 64, Ex. A, p. 2/3].  It states that "the approximate amount due to Plaintiff on the execution as of October 6, 2016, is $23,779,322.51 with continuing interest and costs thereafter" and that Lender "will be permitted to credit bid against its judgment." [*Id.* at 2-3/3].  It provides the Erie County parcel numbers of the real estate but provides no other description and no value of the Property. [*Id.*].  The Receiver's Notice states the terms of the sale as requiring a 20% non-refundable deposit at the time of sale, with the balance to be paid within thirty days following the date of the sale and that "[t]he Sale may also be subject to additional terms and conditions which may be announced on the date of the Sale." [*Id.*].  Finally, it states that the "Receiver hereby reserves the right to adjourn this Sale from time to time on its own initiative at the request of [Lender]" and that an adjournment "will be announced at the Sale date or adjourned Sale date, and Receiver will not be required to advertise any such new date." [*Id.*]. The Receiver's Notice also sets up a form of claims procedure to be administered by Lender's lawyer and directs any questions about the sale to Lender's lawyer, not to the

---

[4] The original judgment was amended to reflect the judgment amount of $23,779,332.25 as stipulated to by the parties. [*See* District Ct. Case No. 3:16-CV-393, Doc. # 62].

Receiver.

Although Debtor hired bankruptcy counsel in mid-2016 when it received the default notice, [Lender Ex. 17, p. 145], during the pendency of the Foreclosure Action, Fels and Daniels continued to negotiate "very intently" with Lender for a loan modification. [*Id.* at 150]. According to Daniels, they had a commitment from Metropolitan for funds "to pay the loan down approximately 2-1/2 million;" however, about three days before the sale, they received a letter from Lender rejecting Debtor's offer and stating that it was not going to engage in any further discussion. [*Id.*]. Fels explained that he thought they had "an acceptable deal" in that Lender had given Debtor three requirements that it wanted completed and Debtor had provided Lender a written proposal but that "it wasn't until the 11th hour when it became apparent that [Lender was not] interested in modifying the loan documents." [Lender Ex. 18, p. 108].

Debtor's Chapter 11 bankruptcy petition was then filed on March 30, 2017, one day before the scheduled Receiver's sale. According to Daniels, he believed there to be a substantial amount of equity in the Property. [Lender Ex. 17, p. 143]. Both Daniels and Fels testified at their Rule 2004 examination that Debtor's bankruptcy petition was filed in an effort to protect that equity. [*Id.*; Lender Ex. 18, p. 104].

Debtor's bankruptcy schedules list only two unsecured creditors – Goodman, as holding a claim for broker fees in the amount of $46,400.00, and Marshall & Melhorn, LLC, as holding a claim for legal fees and expenses in the amount of $51,155.86. [Doc. # 55, p. 13/29]. In addition to the Property, Debtor's schedules include as assets of the estate "potential claims" against Baird for unauthorized loans from Debtor and against Daniels "for advancements made on fee charged for sale of property." [*Id.* at 6/29].

Craig Fuller ("Fuller"), Vice President and Senior Director with the National Retail Group within Marcus and Millichap, specializes in retail acquisition and sales in the Midwest, with an extensive record in selling shopping centers. Fuller provided Debtor with a broker's opinion of value ("BOV") on April 25, 2017. At its current occupancy rate of 92.17%, he valued the Property at $24,465,000.00 and his pro forma valuation of the Property at 100% occupancy is $26,865,000.00. [Debtor's Ex. B]. Fuller testified that, although the letter of intent to purchase received by Debtor in 2015 as a result of Fuller marketing the property was for a sale price of $28,000,000.00, the current market is not as strong as it was in 2015.

In determining the value of the Property, he used a capitalization rate approach that reflects the risk an investor would apply to determine value. While the capitalization rates used by him were criticized by Alex J. Pisallo, Senior Vice President and Managing Partner of Receiver, NAI Daus, Fuller explained that the determination is property specific and that Debtor's Property is a high quality asset, which he describes

as an "A" asset in an A/B market with a number of national retailers, including Home Depot, Jo-Ann Fabrics, and Petco. Nevertheless, Pisallo testified that the rates should be adjusted upward, resulting in a lower sale price, when property is sold in a bankruptcy proceeding.

Fuller also testified regarding his resources for marketing the Property. He testified that if listed with Marcus & Millichap, the Property would have maximum exposure to its database of over 15,000 investors and 2,000 agents nationwide and his BOV would be provided to potential buyers. The BOV provides a detailed description of the Property, including a list of the stores leasing space at the Property, a financial summary that includes rental income and operating expenses, and photographs of the Property and its location. [*See* Debtor Exs. B & C]. Fulller testified that no fees would be due Marcus & Millichap unless and until the Property is sold.

## LAW AND ANALYSIS

The UST and Lender seek dismissal for cause pursuant to 11 U.S.C. § 1112(b). Both the UST and Lender seek dismissal for cause based on their contention that the petition was filed in bad faith. In addition, the UST seeks dismissal under § 1112(b)(4)(A).

Section 1112(b) provides in pertinent part:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).[5] Section 1112(b)(4) provides a non-exhaustive list of examples of "cause" for dismissal of a Chapter 11 case, including a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). In addition to the non-exhaustive list under § 1112(b)(4), the Sixth Circuit has "consistently held that a debtor's Chapter 11 petition may be dismissed if it was filed in bad faith." *Trident Assocs. Ltd. P'ship v. Metropolitan Life Ins. Co. (In re Trident Assocs. Ltd. P'ship )*, 52 F.3d 127, 130 (6th Cir. 1995). A determination of cause for dismissal under § 1112(b) requires "a 'case-specific' factual inquiry which 'focuses on the circumstances of each debtor.'" *In re Creekside Senior Apartments., L.P.*, 489 B.R. 51, 60 (B.A.P. 6th Cir. 2013) (quoting *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest*

---

[5] At the hearing on the motions to dismiss, the court raised the issue of appointment of a trustee under § 1104(a). Debtor, as well as the UST and Lender, convincingly argued that appointment of a Chapter 11 trustee would not be in the best interest of creditors and the estate if there is cause.

*Assocs., Ltd.)*, 808 F.2d 363, 371–72 (5th Cir.1987)). The party seeking dismissal carries the burden of proving that cause exists by a preponderance of the evidence. *Id.*

**I. 11 U.S.C. § 1112(b)(4)(A)**

As stated above, cause for dismissal exists if there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). Because § 1112(b)(4)(A) is written in the conjunctive, both requirements must be shown. *In re Wahliei,* 417 B.R. 8, 11 (Bankr. N.D. Ohio 2009). With respect to the first requirement, the focus is on whether post-petition, the debtor has suffered or continues to experience a negative cash flow, or, alternatively, declining asset values. *Id.*

While Fuller testified that Debtor's assets have declined in value since 2015 given the present market, there is no evidence that Debtor's assets have declined in value since its petition was filed, which is the requirement under § 1112(b)(4)(A). And the record is silent as to Debtor's post-petition finances. However, the Receiver's most recent financial report for Debtor filed in District Court for the month of February 2017, shows a year-to-date positive cash flow of $337,314.50 and year-to-date net income of $167,904.11. [District Court Case No. 3:16-CV-393, Doc. # 65-1, pp. 8/42, 40/42].

Nevertheless, citing *In re Buttermilk Towne Center, LLC*, 442 B.R. 558 (B.A.P. 6th Cir. 2010), the UST argues that because Debtor owns no unencumbered assets with which to offer Lender adequate protection, turnover of its assets from the Receiver to the Debtor would result in an immediate and substantial loss to the estate. In *Buttermilk,* the court addressed the issue of whether a lender is adequately protected by a replacement lien on rents in which the lender already has a security interest. *Id.* at 565. The court stated that it would follow the reasoning in *Stearns Building v. WHBCF Real Estate (In re Stearns Building)*, 165 F.3d 28 (Table), 1998 WL 661071 (6th Cir. Sept. 3, 1998), wherein the Sixth Circuit Court of Appeals explained that "[the lender] is entitled to receive adequate protection for Debtor's use of the *net* rents generated post-petition if the rents constitute 'cash collateral' and there is compliance with 11 U.S.C. § 552(b)." *Id.* at 565-56 (emphasis added). In light of the holding in *Buttermilk*, Debtor states that it will not seek to use, and Lender shall be entitled to retain during this proceeding, the net rents generated from the Property.

Moreover, the court finds the UST's argument that turnover of assets to Debtor by the Receiver would result in a substantial loss to the estate to be premature since the court has not required such turnover. A "substantial loss" as cause for dismissal under § 1112(b)(4)(A) requires such a loss to have already

11

occurred. Likewise, a "continuing loss" requires that a loss has occurred and is ongoing.

The UST has thus not met his burden of proving a substantial or continuing loss to or diminution of Debtor's estate. Having failed to do so, the court need not address the second requirement under § 1112(b)(4)(A) – whether there is an absence of a reasonable likelihood of rehabilitation.

**II. Bad Faith**

"A debtor's bad faith at any stage of a Chapter 11 case – 'commencement, during its prosecution, or at confirmation' – is cause for dismissal under § 1112(b)." *In re Four Wells Ltd.,* No. 15-8020, 2016 WL 1445393, *11, 2016 Bankr. LEXIS 1673, *31 (B.A.P. 6th Cir. April 12, 2016) (quoting *In re Alder* 329 B.R. 406, 410 (Bankr. S.D.N.Y. 2005)). In this case, the UST and Lender argue that Debtor acted in bad faith in filing its Chapter 11 petition.

A determination as to whether a debtor has acted in bad faith is a "'fact-specific and flexible determination' that must be made on a case-by-case basis by looking to a totality of the circumstances." *In re Lee*, 467 B.R. 906, 917 (B.A.P. 6th Cir. 2012) (quoting *Alt v. United States (In re Alt)*, 305 F.3d 413, 419 (6th Cir. 2002)). While there is no single test for determining good faith, the Sixth Circuit has set forth eight factors, none of which are dispositive, that may be probative in evaluating an organizational debtor's good faith:

> (1) the debtor has one asset;
> 
> (2) the pre-petition conduct of the debtor has been improper;
> 
> (3) there are only a few unsecured creditors;
> 
> (4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;
> 
> (5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;
> 
> (6) the filing of the petition effectively allows the debtor to evade court orders;
> 
> (7) the debtor has no ongoing business or employees; and
> 
> (8) the lack of possibility of reorganization.

*Trident Assocs. Ltd. P'ship,* 52 F.3d at 131 (quoting *Laguna Assocs. Ltd. P'ship v. Aetna Casualty & Surety Co. (In re Laguna Assocs. Ltd. P'ship)*, 30 F.3d 734, 738 6th Cir. 1994)). The court thus addresses the *Trident* factors as they relate to this case.

The first *Trident* factor is whether debtor has only one asset. This factor "has been characterized

12

17-30905-maw    Doc 79    FILED 06/07/17    ENTERED 06/07/17 16:42:48    Page 12 of 18

as 'new debtor syndrome' and includes single-asset debtors created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors." *MRL Residential Leasing, Inc. v. Investaid Corp. (In re MRL Residential Leasing, Inc.)*, 121 F3d 709 (Table), 1997 WL 453163, *4, 1997 U.S. App. LEXIS 21525, *12 (6th Cir. Aug. 8, 1997).

This case is a single asset real estate case. But Debtor was not created on the eve of foreclosure and has no characteristics of the "new debtor syndrome," facts that were central to the Sixth Circuit's dismissal analysis in both *Trident Assocs. Ltd. P'ship* and *Laguna Assocs. Ltd. P'ship*. As Debtor correctly argues, the Bankruptcy Code specifically contemplates single asset real estate cases being filed, *see* 11 U.S.C. §101(51B) & § 363(d)(3), and does not contemplate dismissal simply because it is a single asset real estate case. The court finds that this factor does not weigh in favor of dismissal in this case.

Although Debtor has no employees, it has an ongoing business in leasing and managing the Property. Unlike the debtor in *Laguna Assocs. Ltd. P'ship*, this case does not present "a situation where the Property cannot itself support its expenses and required debt payments." *Laguna Assocs. Ltd. P'ship*, 30 F.3d at 736. Properly managed, as shown by the Receiver's agent, cash flow from the property is presently more than sufficient to cover its expenses. The court finds that this factor does not weigh in favor of dismissal in this case.

Debtor has only two scheduled unsecured creditors. However, those creditors are scheduled with significant claims in the amounts of $46,400.00 and $51,155.86. Nevertheless, this factor weighs in favor of dismissal in this case. The unsecured creditors are clearly not driving this case from Debtor's perspective and they have not appeared in this case to advocate their interests.

Debtor and Lender had proceeded to a standstill in the Foreclosure Action and a judgment in foreclosure had been entered by the District Court. Debtor then filed its bankruptcy petition on the eve of the scheduled foreclosure sale, quite clearly to prevent the sale from taking place. But the timing of the filing of Debtor's petition was not arbitrary, occurring after the Debtor's efforts to resolve the debt on a mutually acceptable basis were terminated with a letter from the Lender received just a few days before the scheduled foreclosure sale. While filed at the last minute before the foreclosure sale, Debtor presented a reason for the exacerbated timing that has not been rebutted. The filing stopped the sale, which was ordered by the District Court. But no other court orders have been identified in this case that Debtor is evading as a result of the Chapter 11 petition. Thus, *Trident* factors (4) through (6) overlap to the same end in this case and do not collectively weigh in favor of dismissal.

According to Lender, with respect to the eighth *Trident* factor, there is no possibility of Debtor's reorganization. In the context of a determination as to whether Debtor filed its bankruptcy petition in bad faith, the court believes the inquiry must be whether, *at the time of filing*, there was no *possibility* of reorganization. *In re Lady Bug Corporation,* 500 B.R. 556, 564 (Bankr. E.D. Tenn. 2013)(bankruptcy court's determination that the property debtor relied on to reorganize was not property of the estate and that debtor thus had nothing to reorganize did not make the case a bad faith filing where debtor had reason to believe otherwise *at filing*). Lender argues that a confirmable plan is likely to be premised on a loan modification to which it would object based on Debtor's credit worthiness and history of mismanagement. Instead, Debtor states that its objective is to propose a plan that would result in the full amount of Lender's claim to be paid within a short time, presumably then by either obtaining a source for refinancing the debt or by selling the Property through a process different than the proposed Receiver's sale.[6] Debtor had received a purchase offer of $28,000,000.00 in 2015 and of $29,500,000.00 in 2016. While those offers did not result in a purchase contract, the court nevertheless finds it reasonable for Debtor to believe at the time of filing that it could either sell the Property or obtain sufficient financing to pay the judgment debt owed to Lender. The court notes that while the Judgment Entry sets forth the amount of the debt owed as of October 6, 2016, and the amount of the per diem interest, additional sums to be added to and subtracted from those amounts (*i.e.* costs, attorney fees, amounts paid by the Receiver to Lender) are left undetermined. The court finds that this factor does not weigh in favor of dismissal in this case.

Finally, the UST and Lender rely heavily on the second *Trident* factor, improper pre-petition conduct of Fels and Daniels as providing ample evidence of bad faith. In contrast to the shenanigans in both *Trident Assocs. Ltd. P'ship* and *Laguna Assocs. Ltd. P'ship*, the problematic pre-petition conduct identified in this case occurred back in connection with and precipitated the loan default, not in connection with the bankruptcy filing process itself. Their actions were not taken on the eve of bankruptcy with the purpose of disadvantaging the Lender. That's not to say, however, that the actions of Fels and Daniels should be disregarded in the context of bankruptcy. And the court recognizes that they had not been in control of the Property and the rents since the Receiver's appointment.

---

[6] Debtor expressed an intent to hold the Property (for up to a year) to lease it up to maximize value and only then sell it. Fuller, whose expertise is in selling shopping centers, testified that 100% occupancy would increase the value of the Property. Pacella, whose expertise is not necessarily in shopping centers, testified that 100% occupancy at any particular time will still be discounted by buyers because there is always tenant and market risk. In denying the motions to dismiss, the court is not blessing or adopting any particular plan or liquidation methodology. That's premature and the work of Chapter 11.

14

Specifically, Movants point to the inter-company loans made in contravention of the single-purpose entity provisions of the Loan Documents and payments to Daniels under the Management Agreement, the DLAA and the Management of Desposition (sic) Fee Agreement. The court does find troubling the conduct of Fels and Daniels in entering into, in particular, the DLAA and the Management of Desposition (sic) Fee Agreement and the method of payments under those agreements. The court finds it hard to justify payments under both the DLAA and the Management Agreement, the duties under which appear to overlap. And while the court does not doubt that Daniels was working hard to either find a buyer or refinancing of Debtor's loan, the court also finds it hard to justify payments under the Management of Desposition (sic) Fee Agreement before a sale occurred and that are based on an estimated sale price of $32,000,000.00. It is also of concern that Fels's duties included the twenty-two other entities in which Baird had an interest and that he used approximately $90,000.00 of Debtor's excess cash to make inter-company loans to some of those entities rather than funding the tenant improvement escrow.

This conduct makes management of Debtor by Fels and Daniels inappropriate. After immediately demanding turnover of control of the rents and the Property from the Receiver, [Doc. # 5], Debtor has since wisely consented thus far to leaving property management hired by the Receiver in place under 11 U.S.C. § 543(d).[7] [Doc. ## 27, 72]. The problematic conduct of Fels and Daniels weighs in favor of dismissal of this case, but not as heavily as Movants argue.

Based on the *Trident* factors as they relate to this case, the UST and Lender argue that the case should be dismissed as a bad faith filing. These factors, however, are not exhaustive and "cannot simply be mechanically tallied." *In re Four Wells Ltd.*, 2016 WL 1445393 at *14. Rather, the court "must look at the factors together and determine whether the petitioner sought to achieve objectives outside the legitimate scope of the bankruptcy laws when filing for protection under Chapter 11." *Id.* (citations omitted); *see Crown Village, LLC v. Arl, LLC (In re Crown Village Farm, LLC)*, 415 B.R. 86, 92 (Bankr. D. Del. 2009) ("Once these pieces of factual information are ascertained, courts must next apply them when considering: '(1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving the going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage.'"; citations omitted); *In re Webb MTN, LLC*, No. 3:07-CV-437. 2008 U.S. Dist. LEXIS 10030, 2008 WL 361402 at *3 (E.D. Tenn. Feb. 8, 2008)(despite the presence of a majority

---

[7] Lender's motion to excuse the Receiver from the turnover requirements of 11 U.S.C. § 543 has been granted on an interim basis and adjourned to a future hearing date to be set by the court. [*See* Doc. ## 27 & 72].

of the *Trident* factors, Chapter 11 case not filed in bad faith).

A factor not included in *Trident's* non-exhaustive list but that the court finds important to a determination of whether this Debtor sought to achieve a legitimate bankruptcy purpose is the manner in which the Receiver sale was noticed and was to take place. The Judgment Entry provides that the Property be sold at a public foreclosure sale pursuant to 28 U.S.C. § 2001, *et seq.* on such terms and conditions as the Receiver shall advertise,[8] thus trusting the terms, conditions and manner of sale of the shopping center to the discretion of the Receiver. As explained earlier, the Receiver noticed the sale once a week for the four weeks preceding the sale date in the Sandusky Register newspaper. The Receiver's Notice stated only the amount due to Lender as of October 6, 2016, "with continuing interest and costs thereafter" but did not state the per diem interest accruing thereafter and made no mention of other sums included in the Judgment Entry. The Receiver's Notice provides that Lender will be permitted to credit bid against its judgment and includes no floor to the credit bid. While the Receiver's Notice provides the Erie County parcel numbers of the real estate, it provides no other description and no value of the Property. The Receiver's Notice provides that twenty percent of the amount of the successful bid, other than a credit bid, would be required as a non-refundable deposit at the time of the sale. It further provides that additional terms and conditions may be announced on the date of the sale and that the sale may be adjourned from time to time at the request of Lender, whose counsel, not the Receiver, is the only person identified to reach out to for information.

The federal statute dealing with notice of a public sale of real estate requires only "notice published once a week for at least four weeks prior to the sale in at least one newspaper regularly issued and of general circulation in the county, state, or judicial district of the United States wherein the realty is situated." 28 U.S.C. § 2002. There is no question that Lender complied with the minimum notice requirements in § 2002 by publishing notice in the Sandusky Register once a week during the four weeks before the scheduled March 31, 2017, sale date. But the Receiver's Notice and public sale procedures fall short of notice and procedures designed to effect a sale that maximizes the value of the Property even at a forced sale and protects the rights of any party other than Lender. The vague specification in the Receiver's Notice that additional terms and conditions may be announced on the date of the sale obliterates the efficacy of notice to an interested buyer. Even with the District Court's Judgment Entry specifying that the Receiver shall conduct the public foreclosure sale "on such terms and conditions as it shall advertise," [Lender's Ex. 11,

---

[8] Although the Judgment Entry curiously refers in the alternative to the sale being conducted by "the U.S. Marshal Service or the Court-appointed receiver," [Lender Ex. 11, p. 4/13], the order appointing NAI Daus as Receiver authorizes it to conduct a sale, [Lender Ex. 8, p. 18/37].

p.4/13], the court questions whether changing the terms and conditions at the sale would comply with that provision of the order of sale. Rather, the process appears only to foster the ability of Lender to obtain the Property by a credit bid against its judgment, with no floor to that bid.

By comparison, the District Court's standing general order regarding procedures in real estate foreclosure actions mimics Ohio procedure as well as the federal statutory procedures in 28 U.S.C. § 2001(b) for private sales of real estate. The general order requires that the subject real property be appraised by three certified appraisers, that the notice include the appraised value, that a minimum bid of two-thirds of the appraised value is required, and a deposit of 10% of the successful bid be made at the time of sale. *See In re: Procedures for Foreclosure Actions Based on Diversity Jurisdiction*, Sixth Amended General Order No. 2006-16 (N.D. Ohio Dec. 17, 2007). [9] *Cf.* 28 U.S.C § 2001(b)(required appraisal and notice requirements for a private sale of realty only).

Also in comparison, the court credits the testimony of Fuller, who specializes in retail acquisition and sales in the Midwest and has an extensive record in selling shopping centers, regarding marketing the Property. He testified that the type of buyer that would most likely be interested in the Property, which he describes as a high quality asset with a high occupancy rate and high quality tenants, would be institutional real estate investment trusts and large private funds. Unlike a listing in the local Sandusky Register newspaper, which is unlikely to reach such potential buyers, if listed with a broker like Marcus & Millichap, for example, the Property would have maximum exposure to over 15,000 investors and 2,000 agents nationwide and potential buyers would be provided a package with the basic information about the Property contained in Fuller's BOV. While the manner and notice of the proposed Receiver sale may comply with the basic statutory provisions of 28 U.S.C. §§ 2001 & 2002, Fuller's testimony shows that the sale set in motion by the Receiver is not designed to attract bidders besides the Lender and to maximize value of the Property even under distressed conditions.

Although some of the *Trident* factors supporting dismissal are present in this case, and while the court finds the prepetition conduct of Fels and Daniels troubling, given the type and quality of the real estate to be sold and the method of noticing and marketing that would be appropriate in order to attract bidders and maximize value, and given the Receiver in its discretion having complied only with the minimal requirements of 28 U.S.C. §§ 2001 & 2002, the court credits the Rule 2004 examination testimony

---

[9] The court takes judicial notice of the District Court's general order pursuant to Fed. R. Evid. 201(b) and Fed. R. Bankr. P. 9017.

of both Fels and Daniels that Debtor's bankruptcy petition was filed in order for them to preserve equity in the property. As explained earlier, it was reasonable for Fels and Daniels to believe at the time of filing that there was equity in the Property and that it could be sold or Debtor could obtain sufficient financing to pay the judgment debt owed to Lender given the purchase offers they had received in 2015 and 2016.

Commencing this Chapter 11 case in order to preserve the going concern or maximize the value of the Debtor's estate serves a valid bankruptcy purpose, *Crown Village, LLC*, 415 B.R. at 92, even though filed on the eve of a foreclosure sale, *In re Four Wells Ltd*, 2016 WL 1445393 at *14 (quoting 7 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1112.07 (16th ed. 2016) and stating that "the bare fact that the debtor desires to obtain the benefits of the automatic stay cannot by itself support a finding of bad faith. [D]ebtor must intend to obtain the benefit . . . for an improper purpose. . . ."). The court finds that it was not unreasonable for Debtor to seek a different forum[10] and different procedures to promote maximization of exposure and value of the Property while still protecting the interests of all parties. *See* 11 U.S.C. §§ 362(d)(3), 363(k), 1111(b), 1123(b)(2)(A)(ii). Considering the totality of the circumstances, in light of the *Trident* factors, the court concludes that Movants have not sustained their burden of proving that Debtor's bankruptcy petition was filed in bad faith for a purpose outside the legitimate scope of the Bankruptcy Code.

**THEREFORE**, for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that the UST's Motion to Dismiss [Doc. # 28] be, and hereby is, **DENIED,** without prejudice; and

**IT IS FURTHER ORDERED** that the Motion of Lender to Dismiss Chapter 11 Case [Doc. # 37] be, and hereby is, **DENIED** without prejudice**.**

###

---

[10] Nothing in this decision precludes the parties from considering consensual development of revised public or even private procedures for conduct of a sale by the Receiver through the District Court case.